

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-19-2001

# Doe v. Delie

Precedential or Non-Precedential:

Docket 99-3019

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Doe v. Delie" (2001). *2001 Decisions.* Paper 160.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/160

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 19, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-3019

JOHN DOE,

    Appellant

v.

JOAN DELIE, Health Care Administrator;
PAUL NOEL, Medical Director; DIANE MANSON,
Medical Nurse/Grievance Officer; SOPHIE SWIKA, Medical
Nurse; KIM ZIMMERMAN, Medical Nurse, and all other
parties et al., relevant to this instant civil action against
them; JAMES PRICE, Superintendent (SCI Pittsbur gh)

Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil Action No. 97-cv-01264)
District Judge: Honorable Donald E. Ziegler

Argued September 11, 2000

Before: NYGAARD, ROTH and GARTH, Cir cuit Judges

(Opinion filed: July 19, 2001)

       Martha E. Johnston, Esquire
        (Argued)
       Wolf, Block, Schorr and
        Solis-Cohen LLP
       1650 Arch Street, 22nd Floor
       Philadelphia, PA 19103-2097

        Attorney for Appellant

D. Michael Fisher, Attorney General
Calvin R. Koons,
 Senior Deputy Attorney General
John G. Knorr, III,
 Chief Deputy Attorney General
Howard G. Hopkirk, Esq.
J. Bart DeLone, Esquire (Argued)
Office of Attorney General of
 Pennsylvania
Strawberry Square, 15th Floor
Harrisburg, PA 17120

 Attorneys for Appellees

Charles W. Kenrick, Esquire
Vincent C. Longo, Esquire (Argued)
Grogan, Graffam & McGinley
Three Gateway Center, 22nd Floor
Pittsburgh, PA 15222

 Attorneys for Appellee,
Paul Noel

OPINION OF THE COURT

ROTH, Circuit Judge:

John Doe, a former inmate of the Pennsylvania Department of Corrections, is HIV-positive. He was informed by the medical staff at the State Correctional Institution at Pittsburgh (SCIP) that his medical condition would be kept confidential. However, because of certain practices permitted by prison officials, Doe's condition was not kept confidential. Doe sued under 42 U.S.C.S 1983, claiming that prison practices violated his right to medical privacy under the Fourteenth Amendment and under the Pennsylvania Confidentiality of HIV-Related Information Act, 35 P.S. S 7601 et seq. The District Court granted defendants' motions to dismiss the S 1983 claims on the basis of qualified immunity, declined jurisdiction over the state claims, and dismissed the case.

Although we ultimately agree that defendants ar e entitled to qualified immunity, we do not agree with the District

2

Court's reasoning. We hold that the Fourteenth Amendment protects an inmate's right to medical privacy, subject to legitimate penological interests. However , because this right was not clearly established at the time of defendants' conduct, we will affirm the dismissal of Doe's complaint.

I. FACTS

John Doe arrived at SCIP on January 11, 1995. Shortly thereafter, Doe was informed by the medical staff that he was HIV-positive. After signing a written consent of disclosure form, he was told that his medical condition would be kept confidential and that medical r ecords relating to his illness would be maintained separately from his general prison file.

Because of certain procedures permitted by defendants, Doe's condition was not kept confidential. Specifically, when Doe was taken for sick call appointments, staf f informed the escorting officers of Doe's medical condition. During physician visits, staff kept the door to the clinic room open, allowing officers, inmates, and guards in the area to see and hear Doe and the treating physician. Finally, while administering medication, nurses announced his medication loudly enough for others to hear , allowing inmates to infer Doe's condition. Doe filed administrative grievances concerning the sick call and medication distribution practices, but the grievances did not bring about any change in the practices.

On July 11, 1997, Doe, proceeding pr o se, filed suit under 42 U.S.C. S 1983 and the Pennsylvania Confidentiality of HIV-Related Infor mation Act, 35 P.S. S 7601 et seq. in the United States District Court for the Western District of Pennsylvania. The complaint named as defendants Joan Delie, Health Care Administrator at SCIP; Dr. Paul Noel, Medical Director of SCIP; Diane Manson, a Nurse/Grievance Officer; and Sophie Swika and Kim Zimmerman, both nurses at SCIP. Doe claimed his constitutional right to privacy was violated by the"open-door" examination room policy, by the disclosure of his medical condition to corrections officer escorts, and by the loud announcement of the names of his medications. He

alleged that these practices made him reluctant to discuss embarrassing symptoms with doctors, subjected him to psychological harassment and humiliation, and caused him to discontinue treatment. Doe requested declaratory and injunctive relief, as well as nominal, compensatory, and punitive damages.

On August 5, 1997, Doe filed motions for a temporary restraining order and a preliminary injunction ordering defendants to provide for nondisclosure of his medical information during sick call visits and medication distribution. The Magistrate Judge recommended that both motions be denied pending service of the complaint and motions on defendants. This Report and Recommendation was adopted by the District Court on September 16, 1997.

After service of the complaint,1 defendants Delie, Manson, and Swika, and defendant Noel by separate motion, moved to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Doe was granted leave to file an amended complaint and did so on Mar ch 3, 1998. The amended complaint added James Price, the superintendent of SCIP, as a defendant and otherwise reasserted Doe's privacy claims. Defendants r easserted their motions to dismiss based, inter alia, on the defense of qualified immunity, which shields public officials from actions for damages unless their conduct was unr easonable in light of clearly established law.

The Magistrate Judge issued a Report and Recommendation on September 21, 1998. The Magistrate found that no clear federal constitutional right to nondisclosure of an inmate's medical condition exists and recommended dismissal of defendants Delie, Manson, Swika, and Price on grounds of qualified immunity. The Magistrate found that the only involvement alleged as to defendant Noel was his inadequate response to Doe's grievances, which did not give rise to a S 1983 claim. In addition, the Magistrate Judge found, sua sponte , that

_____

1. Nurse Zimmerman was never served with pr ocess in the district court. She is not a Commonwealth employee, and was appar ently referred to SCIP through a private nursing facility. Ef forts to locate her at that agency were unsuccessful.

4

defendant Zimmerman was entitled to qualified immunity for her alleged misconduct and recommended dismissal of the complaint against her pursuant to 28 U.S.C. S 1915(e)(2)(B)(ii). Finally, the Magistrate Judge recommended that the District Court decline to exercise supplemental jurisdiction over Doe's state law claims.

Over Doe's objections, the District Court adopted the Magistrate Judge's Report and Recommendation and dismissed the case on December 17, 1998. On January 13, 1999, Doe filed his notice of appeal of the District Court's decision. We appointed counsel for Doe and have benefitted as a result from counsel's willingness to undertake this representation.

Shortly before oral argument, counsel informed us that Doe was awaiting a re-trial on his conviction. Counsel has now informed us that Doe was acquitted in his re-trial, and therefore is no longer an inmate at SCIP .

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had subject matter jurisdiction over Doe's S 1983 claims pursuant to 28 U.S.C.S 1331 and over the state law claim under 28 U.S.C. S 1367. W e have appellate jurisdiction over the District Court'sfinal judgment pursuant to 28 U.S.C. S 1291. W e exercise plenary review over the District Court's dismissal of a complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim. Piecknick v. Commonwealth of Pennsylvania, 36 F.3d 1250, 1255 (3d Cir. 1994). W e must accept as true all of the factual allegations in the complaint as well as the reasonable inferences that can be drawn fr om them. Moore v. Tartler, 986 F.2d 682, 685 (3d Cir. 1993). We may dismiss the complaint only if it is clear that no r elief could be granted under any set of facts that could be pr oved consistent with the allegations. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).

## III. DISCUSSION

Because Doe is no longer an inmate at SCIP, we must first consider whether his claims are moot before reviewing the District Court's qualified immunity analysis.

## A. MOOTNESS

The Constitution limits the power of the federal judiciary to the resolution of "cases and contr oversies." See U.S. Const. art. III, S 2, cl.1. Federal courts ar e not empowered to decide moot questions. North Carolina v. Rice, 404 U.S. 244, 246 (1971) (per curiam). The mootness doctrine requires that an actual controversy exist at all stages of review, not merely at the time the complaint is filed. New Jersey Turnpike Auth. v. Jersey Cent. Power & Light, 772 F.2d 25, 31 (3d Cir. 1985).

We have stated that "mootness has two aspects: (1) the issues presented are no longer `live' or (2) the parties lack a cognizable interest in the outcome." Id. As a result of his acquittal, Doe is no longer an inmate at SCIP . It is clear that any declaratory or injunctive relief with respect to the staff at SCIP would have no impact on him, and therefore his equitable claims are moot.

Doe argues that his case falls into the "capable of repetition, yet evading review" exception to the mootness doctrine. The exception is limited to cases which have two elements: "(1) the challenged action was in its duration too short to be fully litigated to its cessation or expiration and (2) there is a reasonable likelihood that the same complaining party would be subjected to the same action again." Abdul–Akbar v. Watson, 4 F .3d 195, 206 (3d Cir. 1993) (emphasis omitted), quoting Weinstein v. Bradford, 423 U.S. 147, 149 (1975)(per curiam). Given the length of time it took Doe, proceeding pro se  and in forma pauperis, to reach this stage of the litigation, we will assume, arguendo, that the first element is satisfied.

However, as a result of his acquittal, we simply cannot conclude that there is a reasonable likelihood that he would be subjected to the same conduct. See Weinstein, 423 U.S. at 149 (former inmate's challenge to par ole decisions mooted upon his release from supervision); see also Abdul–Akbar, 4 F.3d at 206 (cautioning against"conjecture" that prisoner could again be incarcerated at maximum security unit and holding prisoner's release from maximum security unit mooted challenge to law library in maximum security unit).2 Doe is no longer incar cerated at SCIP. Because there

_____

2. But see Doe v. Wigginton, 21 F .3d 733, 736 (6th Cir. 1994) (no discussion of mootness, although facts state plaintiff was released from

is no reasonable likelihood that Doe will be subjected to the
same action, Doe's acquittal has clearly mooted his claims
for declaratory and injunctive relief.

Nonetheless, where a plaintiff has r equested several
forms of relief and some of the r equests become moot, the
court must still consider the viability of the r emaining
requests. Jersey Cent. Power & Light Co. v. State of New
Jersey, 772 F.2d 35, 40 (3d Cir. 1985). "[T]he availability of
damages or other monetary relief almost always avoids
mootness." Id. at 41.3 Therefore, we must review the
District Court's qualified immunity analysis with respect to
Doe's nominal and punitive damages claims.

B. A PRISONER'S RIGHT TO PRIVACY IN MEDICAL
RECORDS

Section 1983 imposes civil liability upon any person who,
acting under the color of state law, deprives another
individual of any rights, privileges or immunities secured by
the Constitution or laws of the United States. 42 U.S.C.
S 1983. This section does not create any new substantive
rights, but it provides a remedy for the violation of a federal
constitutional or statutory right conferred elsewhere. Baker
v. McCollan, 443 U.S. 137, 144 n.3 (1979).

_____

prison prior to appeal). The Sixth Circuit r eached the merits to dismiss
the privacy claim of an HIV-positive prisoner , but, as discussed in
footnote six, infra, the substantive law of privacy in the Sixth Circuit
conflicts with that of the Third Circuit.

3. While the District Court did not consider the effect of S 803(d)(e) of
the
Prison Litigation Reform Act, codified at 42 U.S.C. S 1997e(e), on Doe's
claims, we have since recognized that S 1997e(e) prohibits compensatory
damages for mental or emotional injury absent allegations of physical
injury. Allah v. Al-Hafeez, 226 F.3d 247, 251 (3d Cir. 2000). However,
S 1997e(e) does not bar claims seeking nominal damages to vindicate
constitutional rights, nor claims seeking punitive damages to deter or
punish egregious violations of constitutional rights. Id. Therefore, while
Doe's claims for compensatory damage are barr ed by S 1997e(e), his
claims for nominal damages survive. Moreover , to the extent that Doe's
punitive damages claims stem solely from the violations of his right to
medical privacy, and not from any emotional or mental distress suffered,
those claims are not barred by S 1997e(e). See id. at 252.

7

When the defendant in a S 1983 action claims qualified immunity, a court must first determine if the plaintiff 's allegations are sufficient to establish the violation of a federal constitutional or statutory right. W ilson v. Layne, 526 U.S. 603, 609 (1999), citing Conn v. Gabbert , 526 U.S. 286, 290 (1999).[4] If the plaintif f 's allegations meet this threshold, a court must next determine whether the right that the defendant's conduct allegedly violated was a clearly established one, about which a reasonable person would have known. Id. If the plaintiff 's allegations fail to satisfy either inquiry, then a defendant is entitled to qualified immunity and dismissal of the case. Deciding "this purely legal question permits courts expeditiously to weed out suits which fail the test without requiring a defendant who rightly claims qualified immunity to engage in expensive and time consuming preparation to defend the suit on its merits." Siegert v. Gilley, 500 U.S. 226, 232 (1991).

With this framework in mind, we must deter mine whether an HIV-positive inmate has a right to privacy in his medical information. If so, we must deter mine whether that right was clearly established in 1995.

---

4. Notwithstanding the fact that the Supr eme Court has twice stated in mandatory, unqualified language that "[a] court evaluating a claim of qualified immunity must first deter mine whether the plaintiff has alleged the deprivation of an actual constitutional right at all . . ." Wilson, 526
U.S. at 609 quoting Conn v. Gabbert, 526 U.S. at 290 (internal quotations omitted) (emphasis added), Judge Garth's dissent would prefer that we skip the first prong of qualified immunity analysis. See Dissent, infra at p. 40. This practice ignor es the Supreme Court's express language and creates an exception based on the procedural posture of the case. While there may be pragmatic considerations favoring Judge Garth's qualification of the Supr eme Court's unqualified language, the Court has not yet suggested any basis for departing from the rule articulated in Wilson. Our thr eshold task here, in qualified immunity analysis, is to determine whether Doe has alleged a violation of a constitutional right. We hold that he has, although the full extent of
that right in the prison setting has yet to be delineated. Whether and how prison officials must accommodate, or may curtail and even extinguish that right, in light of the penological interests concerned, is not before the Court today.

1.

An individual has a constitutional right to privacy which protects "the individual interest in avoiding disclosure of personal matters." Whalen v. Roe, 429 U.S. 589, 599 (1977). We have long recognized the right to privacy in one's medical information: "There can be no question that . . . medical records, which may contain intimate facts of a personal nature, are well within the ambit of materials entitled to privacy protection." United States v. Westinghouse Elec. Corp. 638 F.2d 570, 577 (3d Cir. 1980). The right to privacy in one's medical information extends to prescription records. Doe v. Southeastern Pa. Transp. Auth., 72 F.3d 1133, 1138 (3d Cir. 1995), cert. denied 519 U.S. 808 (1996) [hereinafter "Doe v. SEPT A"]. In Doe v. SEPTA, we acknowledged that the privacy interest in information regarding one's HIV status is particularly strong because of the stigma, potential for harassment, and "risk of much harm from non-consensual dissemination of the information." Id. at 1140.

The District Court recognized Doe's right to privacy in his medical information, but concluded that such a right does not exist in prison. We disagree. As the Supreme Court has noted, prison inmates do not shed all fundamental protections of the Constitution at the prison gates. Wolff v. McDonnell, 418 U.S. 539, 555 (1974). Inmates r etain those rights that are not inconsistent with their status as prisoners or with the legitimate penological objectives of the corrections system. Pell v. Procunier, 417 U.S. 817, 822 (1974).

For example, prisoners retain rights af forded by the First Amendment. O'Lone v. Shabazz, 482 U.S. 342, 348 (1987). They retain the protection of due pr ocess, Wolff, 418 U.S. at 555, and the protection against racial discrimination. Lee v. Washington, 390 U.S. 333, 334 (1968) (per curiam). Of course, prisoners retain the Eighth Amendment's protection against cruel and unusual punishment. Wilson v. Seiter, 501 U.S. 294, 297 (1991). While many rights survive incarceration, however, it is clear that some rights retained by free citizens are necessarily extinguished by imprisonment.

The defendants correctly assert that prisoners do not have a Fourth Amendment right to privacy in their cells. Hudson v. Palmer, 468 U.S. 517, 529 (1984). The Supreme Court has concluded that the Fourth Amendment right to privacy, to be free from unreasonable searches, is fundamentally inconsistent with incarceration. Id. at 527. Mindful that internal security is a chief concern in prisons, the Court recognized that it would be impossible to prevent the introduction of weapons, drugs and other contraband into the premises if prisoners maintained a right of privacy in their cells. Id. Therefore,"the Fourth Amendment has no applicability to a prison cell." Id. at 536.

However, Doe's asserted right to privacy in his medical information is completely differ ent than the right extinguished in Hudson. See, e.g., Powell v. Schriver, 175 F.3d 107, 112 n.3 (2d Cir. 1999) (noting right to confidentiality of medical information is distinct from right of privacy implicated in Hudson); Anderson v. Romero, 72 F.3d 518, 522 (7th Cir. 1995) (same). The Hudson court confirmed that a Fourth Amendment right to be free from unreasonable searches and seizures is inconsistent with incarceration. In the instant case, Doe is asserting his Fourteenth Amendment right to privacy in his medical information. The right to nondisclosur e of one's medical information emanates from a different source5 and protects

_____

5. The Fourth Amendment prohibits the gover nment from conducting unreasonable searches and seizures. U.S. Const. amend. IV. While courts and commentators have emphasized the privacy interests protected by the Fourth Amendment, the Supr eme Court has clarified that the Fourth Amendment "protects individual privacy against certain kinds of governmental intrusion, but its pr otections go further, and often
have nothing to do with privacy at all." Katz v. United States, 389 U.S. 347, 350 (1967).

There are at least two types of privacy pr otected by the Fourteenth Amendment: the individual interest in avoiding disclosure of personal matters, and the right to autonomy and independence in personal decision-making. See Whalen, 429 U.S. at 599-600; Westinghouse, 638 F.2d at 577. Cases in the latter category describe the liberty interests in
matters relating to marriage, procr eation, contraception, family relationships, and child rearing and education. See e.g. Troxel v. Granville, 120 S.Ct. 2054 (2000) (parents' rights to make decisions

10

different interests than the right to be free from unreasonable searches and seizures. Compare Whalen, 429 U.S. at 598–99 with Hudson, 468 U.S. at 525.

It is beyond question that information about one's HIV-positive status is information of the most personal kind and that an individual has an interest in pr otecting against the dissemination of such information. See Doe v. SEPTA, 72 F.3d at 1140; Westinghouse, 638 F.2d at 577. Moreover, a prisoner's right to privacy in this medical infor mation is not fundamentally inconsistent with incarceration. Therefore, we join the Second Circuit in recognizing that the constitutional right to privacy in one's medical information exists in prison. See Powell, 175 F.3d at 112.

We acknowledge, however, that a prisoner does not enjoy a right of privacy in his medical information to the same extent as a free citizen. We do not suggest that Doe has a right to conceal this diagnosed medical condition fr om everyone in the corrections system. Doe's constitutional right is subject to substantial restrictions and limitations in order for correctional officials to achieve legitimate correctional goals and maintain institutional security.

Specifically, an inmate's constitutional right may be curtailed by a policy or regulation that is shown to be "reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987). Courts must respect the administrative concerns underlying a prison regulation, without requiring proof that the regulation is the least restrictive means of addressing those concerns. We have summarized the analysis as follows:

_____

concerning care and custody of childr en); Roe v. Wade, 410 U.S. 113 (1973) (right to abortion); Loving v. Vir ginia, 388 U.S. 1 (1967) (freedom
to marry); Griswold v. Connecticut, 381 U.S. 479 (1965) (right to marital privacy in use of contraceptives); Pierce v. Society of Sisters, 268 U.S. 510 (1925) (parents' right to teach own childr en); Meyer v. Nebraska, 262 U.S. 390 (1923) (right to teach foreign language). As described above, Doe's privacy interest clearly falls into the first category. Some courts have referred to the first category as a "right to confidentiality," to
distinguish it from the right to autonomy and independence in personal decision making. E.g. Powell v. Schriver , 175 F.3d 107, 113–14 (2d. Cir. 1999).

11

> [Turner] directs courts to assess the overall
> reasonableness of such regulations by weighing four
> factors. First, there must be a valid, rational
> connection between the prison regulation and the
> legitimate governmental interest put forward to justify
> it, and this connection must not be so remote as to
> render the policy arbitrary or irrational. Second, a
> court must consider whether inmates retain alternative
> means of exercising the circumscribed right. Third, a
> court must take into account the costs that
> accommodating the right would impose on other
> inmates, guards, and prison resour ces generally. And
> fourth, a court must consider whether there ar e
> alternatives to the regulation that fully accommodate
> the prisoner's rights at de minimis cost to valid
> penological interests.

Dehart v. Horn, 227 F.3d 47, 51 (3d Cir. 2000) (en banc)
(internal quotations omitted).

Appellant alleges that his constitutional right to privacy
in his medical information was violated by thr ee practices:
the "open-door" examination room policy, the disclosure of
his medical condition to corrections officer escorts, and the
loud announcement of the names of his medications. Doe
concedes that the "open door" examination r oom policy
could conceivably be justified by a legitimate security
interest but contends that no such inter est has been
advanced here. In addition, Doe maintains that the other
disclosures are unrelated to any legitimate penological
interests, and thus violated his right to privacy.

Given the disposition of the case by the District Court,
defendants did not have the opportunity to come forward
with any evidence of legitimate penological inter ests, costs
of accommodating Doe's privacy interest, or availability of
alternatives to the disclosures made her e. Based on this
undeveloped record, we are unable to assess any of the
Turner factors. Rather than speculating about these factors,
we ordinarily would remand for consideration by the trial
court on those issues. However, we need not decide those
issues in this case because of our disposition of the second
prong of the qualified immunity analysis.

12

2.

As stated earlier, the qualified immunity doctrine shields public officials from actions for damages unless their conduct was unreasonable in light of clearly established law. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). We have recognized that qualified immunity applies if "reasonable officials in the defendants' position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be lawful." Good v. Dauphin County Social Servs. for Childr en & Youth, 891 F.2d 1087, 1092 (3d Cir. 1989).

Thus, having determined that Doe has alleged a violation of a constitutional right, we must determine whether Doe's right to privacy was "clearly established" in a "particularized" sense. Anderson v. Cr eighton, 483 U.S. 635, 640 (1987). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. W e do not require precise factual correspondence between the right asserted and prior case law. Good, 891 F.2d at 1092. Whether an official may be protected by qualified immunity tur ns on the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." Wilson v. Layne, 526 U.S. 603, 614 (1999) (internal quotes omitted). The issue is whether, given the established law and the information available to Defendants, reasonable prison officials in Defendants' positions could have believed that their conduct was lawful. See Paff v. Kaltenback, 204 F.3d 425, 431 (3d Cir. 2000).

Appellant makes three arguments in support of his contention that his right to privacy in his medical information was clearly established in 1995. First, Doe argues that a Pennsylvania statute both cr eates a right and serves to inform defendants of the existence of that right. Second, Doe argues that, by 1995, a "gr owing consensus" of other courts had held that inmates possess a right to privacy in their medical records. Finally, Doe argues that the class action settlement in Austin v. Pennsylvania Dept. of Corrections, 876 F. Supp. 1437 (E.D.Pa. 1995), put defendants on specific notice of the existence of a prisoner's

13

constitutional right to privacy in his medical infor mation.
We address each argument in tur n.

The Pennsylvania Confidentiality of HIV-Related
Information Act, 35 P.S. S 7603, became effective March 1,
1991. Under the Act, any person who obtains confidential
HIV-related information in the course of providing health or
social services, or pursuant to consent, may not disclose
the information, except by consent, or to certain designated
persons. 35 P.S. S 7607. The state right is enforceable in a
private cause of action for damages. 35 P.S.S 7610. Doe
contends that he consented to the HIV test but did not
consent to the various disclosures made by defendants.
While Doe concedes that the state statute cannot be the
basis for his federal action, he argues that prison officials
could not have been acting "reasonably" when they were in
direct violation of a clear state statute; they thus lost the
protections of qualified immunity.

This argument misinterprets the ef fect of a state law on
a federal constitutional claim. The Supreme Court has held
that officials do not forfeit qualified immunity from suit for
violation of a federal constitutional right because they failed
to comply with a clear state statute. Davis v. Scherer, 468
U.S. 183, 195 (1984); see also D.R. by L.R. v. Middle Bucks
Area Vocat'l Tech. School, 972 F.2d 1364, 1375-76 (3d Cir.
1992) (en banc) ("[I]llegality under the state statute can
neither add to nor subtract from the constitutional validity
of a state's actions.") (internal quotes and citation omitted).
To overcome qualified immunity, Doe's clearly established
right must be the federal right on which the claim for relief
is based.6 Claims for violations of the Pennsylvania
Confidentiality of HIV-Related Infor mation Act can be
vindicated in state courts, or, as Doe did here, as a

_____

6. For example, state law may bear upon a claim under the Due Process
clause when the property interest pr otected by the Fourteenth
Amendment is created by state law. See Boar d of Regents v. Roth, 408
U.S. 564, 577 (1972); Acierno v. Cloutier , 40 F.3d 597 (3d. Cir. 1994). A
federal statute can provide the clearly established right when it is the
basis for the action. See, e.g. Maine v. Thiboutot, 448 U.S. 1 (1980)
(vindicating rights under Social Security Act). This case involves neither
situation.

14

supplemental claim. But the state statute cannot"clearly establish" the federal right for qualified immunity purposes.

Second, a review of decisions which had addr essed the issue by 1995 reveals that no court of appeals had held that prisoners retained a constitutional right to the privacy of their medical information. In fact, only a handful of district court opinions had done so.

The earliest circuit opinion addressing the issue analyzed a prison policy of segregating HIV-positive inmates from the general prison population. Harris v. Thigpen, 941 F.2d 1495, 1515-1521 (11th Cir. 1991). In Harris, the Eleventh Circuit stated that the "precise natur e and scope of the privacy right at issue in this case is rather ill-defined." Id. at 1513. Nevertheless, the court assumed, ar guendo, that HIV-positive inmates had a "constitutionally-protected privacy interest" in nondisclosure of their medical information. The court acknowledged that "the scope of such a right, however, is far from settled, and we need not divine its precise parameters here," Id. at 1513 n. 26, because it found that the Department of Corr ections' decision to segregate such inmates from the general prison population served a legitimate penological inter est in reducing the transmission of HIV and reducing the threat of violence. Id. at 1521.

Prior to 1995, other courts of appeals likewise upheld the segregation of HIV-positive inmates fr om the general population. See, e.g. Camarillo v. McCarthy, 998 F.2d 638, 640 n.2 (9th Cir. 1993) (reserving question of whether HIV segregation policy is constitutional but holding officers entitled to qualified immunity); Moore v. Mabus, 976 F.2d 268, 271 (5th Cir. 1992) (finding HIV segr egation policy reasonably related to legitimate penological interests).7 Of

_____

7. By 1995, the Sixth Circuit had explicitly held that the right of privacy
is not implicated at all by prison official's disclosure of an inmate's HIV
status. See Doe v. Wigginton, 21 F.3d 733, 740 (6th Cir. 1994). However, Sixth Circuit law conflicts with our cir cuit on this issue because the Sixth Circuit does not recognize the right to privacy in one's medical information in any setting. Compare J.P. v. DeSanti, 653 F.2d 1080 (6th Cir. 1981) (no right to privacy in "social histories" and medical records) with United States v. Westinghouse Elec. Corp., 638 F.2d 570 (3d Cir. 1980) (right to privacy in medical recor ds).

15

course, the nature of the disclosures in HIV housing segregation cases is different than the disclosures Doe challenges here.

In 1995, the Seventh Circuit considered disclosures that are closer to the ones that occurred in the present case. Anderson v. Romero, 72 F.3d 518 (7th Cir. 1995). In Anderson, the prison superintendent told a guar d, in the presence of another guard, to make sur e inmate Anderson was in a cell by himself because he was HIV-positive. The information was repeated to at least one other guard. The Anderson court recognized a "qualified constitutional right to confidentiality of medical records and medical communications" outside of prison, but concluded that it was an open question as to whether the right applied in the prison setting. Id. at 522. The court r ejected two district court opinions which had found that nonsystematic disclosures of HIV status had violated HIV -positive inmates' right to privacy and instead relied on the fact no appellate court had yet recognized the right. Id. at 523–25 (discussing Woods v. White, 689 F. Supp. 874 (W.D.Wis. 1988) aff 'd 899 F.2d 17 (7th Cir. 1990) (table) and Rodriguez v. Coughlin, 1989 WL 59607 (W.D.N.Y. 1989). The Anderson court concluded that the officials were entitled to qualified immunity because, if such a right existed, it was not clearly established in 1992 nor in 1995.8Id. at 524.

---

8. The appellate cases illustrate the problem identified by the Supreme Court in qualified immunity cases: "[T]he generally sound rule of avoiding determination of constitutional issues does not readily fit the situation presented here [because] when liability is claimed on the basis of a constitutional violation, even a finding of qualified immunity requires some determination about the state of constitutional law at the time the officer acted. What is more significant is that if the policy of avoidance [of constitutional issues] wer e always followed in favor of ruling on qualified immunity whenever ther e was no clearly settled constitutional rule of primary conduct, standar ds of official conduct would tend to remain uncertain, to the detriment both of officials and individuals. An immunity determination, with nothing more, provides no clear standard, constitutional or non-constitutional . . . . therefore the better approach is to determine the right before determining whether it was previously established with clarity." County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998). See also W ilson v. Layne, 526 U.S. 603, 609 (1999).

16

We note that Doe has cited several district court cases which concluded, by 1995, that inmates have a right to privacy in their medical information. See Austin v. Pennsylvania Dept. of Corrections, 876 F . Supp. 1437 (E.D.Pa. 1995) (approving class action settlement including policies regarding treatment of HIV positive inmates); Clarkson v. Coughlin, 898 F. Supp. 1019 (S.D.N.Y. 1995) (failure to provide qualified interpr eters violated deaf inmates' right to privacy); Faison v. Parker, 823 F. Supp. 1198 (E.D. Pa. 1993) (disclosure of inmate's medical conditions in presentence report did not violate right to privacy); Nolley v. County of Erie, 776 F . Supp. 715 (W.D.N.Y. 1991) (HIV-positive inmate's right to privacy violated by involuntary segregation and placing red stickers on his documents); Doe v. Coughlin, 697 F . Supp. 1234, 1238 (N.D.N.Y. 1988) (granting preliminary injunction to halt involuntary segregation of HIV-positive inmates); Woods v. White, 689 F. Supp. 874, 876 (W.D. Wis. 1988), aff 'd 899 F.2d 17 (7th Cir . 1990) (table) (gratuitous disclosure of HIV-positive status to guar ds and inmates violated constitutional right to privacy).

Of course, all of these opinions are factually and legally distinguishable from the present case. Both Nolley and Doe v. Coughlin are HIV-positive inmate segregation cases. These cases conflict with the subsequent appellate HIV segregation cases, which upheld the practice. 9 See Camarillo, 998 F.2d at 640; Moor e, 976 F.2d at 271; Harris, 941 F.2d at 1515-21. Likewise, the district court decision in White v. Woods was specifically considered and rejected by the Seventh Circuit's opinion in Anderson v. Romero. 72 F.3d at 525 (holding prisoners had no clearly established right to privacy in medical records in 1995). In Faison, the district court found that disclosure of an inmate's medical conditions in a court-ordered presentence report did not violate the inmate's right to privacy. 823 F . Supp. at 1205. And Clarkson v. Coughlin addressed deaf inmates, not HIV-positive ones. 898 F. Supp. at 1024.

_____

9. These opinions also conflict with other New York district court cases which upheld the segregation of HIV-positive inmates. See Baez v. Rapping, 680 F. Supp. 112 (S.D.N.Y. 1988); Cordero v. Coughlin, 607 F. Supp. 9 (S.D.N.Y. 1984).

In short, none of these decisions, individually or collectively, makes it sufficiently clear to r easonable officials that their conduct violated a prisoner's federal constitutional right. District court opinions may be relevant to the determination of when a right was clearly established for qualified immunity analysis.10 However, in this case, the absence of binding precedent in this cir cuit,11 the doubts

_____

10. See Hayes v. Long, 72 F.3d 70, 73-74 (8th Cir. 1995) (looking to all decisional law, including Supreme Court, cir cuit courts, district courts, and state court opinions for clearly established rights); Tribble v. Gardner, 860 F.2d 321, 324 (9th Cir . 1988)(same). We note that the Fourth, Tenth and Eleventh Circuits do not look to district court decisions to determine if rights are clearly established. See, e.g., Anaya v. Crossroads Managed Care Sys., Inc., 195 F.3d 584, 594 (10th Cir. 1999) (considering only Supreme Court, forum circuit, highest state court, or clearly established weight of authority fr om other circuit courts); Edwards v. City of Goldsboro 178 F.3d 231, 251 (4th Cir. 1999)(considering only Supreme Court, forum cir cuit and highest state court); Jenkins by Hall v. Talladega City Bd. of Educ., 115 F.3d 821, 826 n.4 (11th Cir.) cert. denied, Jenkins ex rel. Hall v. Herring, 522 U.S. 966
(1997)(same). The Second and Seventh Circuits consider district court opinions as evidence of the law but hold that they cannot clearly establish the law of the circuit. Anderson , 72 F.3d at 525; Jermosen v. Smith, 945 F.2d 547, 551 (2d Cir. 1991). The Sixth Circuit has held that a district court must find binding precedent from the Supreme Court, the Sixth Circuit, or from itself. Ohio Civil Serv. Employees Ass'n v. Seiter, 858 F.2d 1171, 1177 (6th Cir . 1988).

We have held that district court decisions do not establish the law of the circuit, and are not even binding on other district courts within the district. Threadgill v. Armstrong World Indus., Inc., 928 F.2d 1366, 1371 (3d Cir. 1991). Yet, as our prior decisions have illustrated, district court
opinions do play a role in the qualified immunity analysis. See e.g. Pro v. Donatucci, 81 F.3d 1283 (3d Cir . 1996) (affirming district court's reliance on Fifth Circuit opinion and two district court opinions to find clearly established right in qualified immunity analysis); cf. Brown v. Grabowski, 922 F.2d 1097 n.13 (3d Cir . 1990) (accepting the use of out of circuit and district court opinions in qualified immunity analysis but reversing because opinions had been render ed after conduct in question).

11. The absence of circuit precedent does not mean an official will always retain the immunity defense. "The easiest cases don't even arise." United States v. Lanier, 520 U.S. 259, 271 (1997) (citations and internal quotation marks omitted).

18

expressed by the most analogous appellate holding, together with the conflict among a handful of district court opinions, undermines any claim that the right was clearly established in 1995.

Finally, we address Doe's argument r egarding the settlement in Austin v. Pennsylvania Dept. of Corrections, 876 F. Supp. 1437 (E.D.Pa. 1995). In Austin, the district court accepted a negotiated settlement between a class of inmates and the Pennsylvania Department of Corr ections over numerous prison conditions, including medical care. As part of the settlement, the DOC agreed to keep inmates' medical information regarding their HIV status confidential and to advocate a universal precautions policy instead of a notification policy in future union negotiations. Id. at 1453. Doe argues that, in light of the Austin settlement, prison officials could not reasonably believe that non–consensual disclosures of an inmate's HIV status wer e lawful.

We agree that, in some ways, the Austin settlement is more persuasive than the scattered district court opinions previously discussed. Austin has significant factual correspondence to Doe's case. In addition, the opinion documents the participation of the DOC in lengthy negotiations regarding treatment of HIV–positive inmates to settle the class action. Cf. Buckley v. Rogerson , 133 F.3d 1125, 1130–31 (8th Cir. 1998) (district court class action judgment against Missouri state prison system clearly established right for Iowa state prisoner to over come qualified immunity defense).

Nevertheless, Austin is also less persuasive than other district court opinions. Rather than providing a decision on the legal merits of the claims, the Austin court merely approved a settlement. As the Austin court itself noted, it "only evaluate[ed] the probable outcome of the litigation and [was] not required to weigh and decide each contention." Austin, 876 F. Supp. at 1464 n.16. The Austin court's statement about the constitutionality of disclosing an inmate's medical information was in r esponse to proposed, and rejected, courses of conduct.12 The legal

―――――――――――――――――――――――――――――――――――――――――――――――――――――――

12. The Austin court stated: "One gr oup of inmates objects to the Settlement Agreement because they believe the provisions which ensure

conclusion regarding the constitutional right to privacy was dictum. It was not binding on the parties and it certainly did not clearly establish a constitutional right.

Nor can the fact that the DOC agreed to settle a case clearly establish a federal constitutional right. The law favors settlement, particularly in class actions and other complex cases, to conserve judicial resour ces and reduce parties' costs. See In Re General Motors Corp. Pick-Up Truck Fuel Tank Litig., 55 F.3d 768, 784 (3d Cir.) cert. denied, General Motors v. French, 516 U.S. 824 (1995). Where, as in Austin, the factual and legal issues wer e numerous, broad and complex, the decision to settle a case cannot be elevated to the recognition of a constitutional right.

Based on the foregoing, we cannot conclude that the cited authorities, individually or in combination, clearly established an inmate's constitutional right to privacy in his medical information. Government officials must stay abreast of constitutional developments, but they are not "expected to predict the future course of constitutional law." Wilson v. Layne, 526 U.S. at 617. We conclude that the contours of defendants' legal obligations under the Constitution were not sufficiently clear in 1995 that a reasonable prison official would understand that the non-consensual disclosure of a prisoner's HIV status violates the Constitution. Accordingly, we will affir m the District Court order granting Defendants qualified immunity from Plaintiff 's claims.13

_____

the anonymity of HIV-infected inmates ar e too stringent. These inmates want the DOC to test all inmates and notify the general population of those inmates who are HIV-positive. Such a notification procedure is unrelated to any penological interest and would most likely violate state law . . . and the Constitution of the United States." Austin, 876 F. Supp. at 1466. With respect to the Turner factors, however, the Austin court stated that "there was no assurance that this Court would order an elimination of the notification provision. Although individuals have an interest in preventing disclosure of their HIV status which is protected by state law and the Constitution, inmates' rights must necessarily yield to a certain extent to legitimate penological inter ests." Id. at 1467.

13. We will likewise affirm the District Court's order dismissing Nurse Zimmerman pursuant to 28 U.S.C. S 1915(e)(2)(B)(ii) for qualified immunity and declining supplemental jurisdiction over the state claims.

20

3.

Although the exact boundaries of such a right have yet to be established, we hold today that prison inmates r etain a Fourteenth Amendment substantive due process right to privacy in their medical information. The exact parameters of a prisoner's right to privacy in that infor mation will have to be determined in a later case on a mor e complete record, where the Turner factors can be fully considered in the context of the penological interests concer ned. Moreover, because we are granting qualified immunity to the defendants, we also do not go on to the issue of the standard that is utilized to determine whether a prisoner's right to privacy in his medical information has been violated. That determination too will have to wait for another day.

IV. CONCLUSION

We hold that the Fourteenth Amendment pr otects an inmate's right to medical privacy, subject to legitimate penological interests. However, because this right was not clearly established at the time of defendants' conduct, we will affirm the District Court's dismissal of Doe's complaint on the basis of qualified immunity.

NYGAARD, concurring and dissenting:

I agree with Judge Roth's conclusion that prisoners have a right to privacy in their medical information, and that this right may be compromised only if it conflicts with a legitimate penological objective that satisfies the criteria outlined in Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254 (1987). I would conclude, however, that Doe's right to privacy in medical matters was clearly established at the time of the alleged violations such that Appellees, as reasonable employees of the Pennsylvania Department of Corrections, should have known that the right existed and therefore cannot be dismissed from defending these allegations on the basis of qualified immunity. Hence, I dissent from the conclusions contained in Section III, B. 2 of Judge Roth's opinion.

It is now axiomatic that the doctrine of qualified immunity bars government officials fr om liability for damages unless they disobeyed "clearly establish[ed] statutory or constitutional rights of which a r easonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982). Debates over defendants' qualified immunity typically tur n on this "clearly established right" clause. The Supr eme Court has unpacked the meaning of Harlow by pr oviding the following analytic parameters: For a right to be clearly established, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right," Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039 (1987). Nonetheless, at the same time, a court need not have ruled on a case bearing a "precise factual correspondence" with the one under consideration. Assaf v. Fields, 178 F .3d. 170 (3d Cir. 1999), cert. denied, 120 S.Ct. 374 (1999). Thus, gover nment officials are not barred from the protection of qualified immunity if they fail to predict fluctuations in legal debates. They will not, however, be granted immunity if they fail to make obvious inferences from a generally established right, to its application in particular situations.

The question is whether these members of the Pennsylvania Department of Corrections should have known from 1995 through 1997 that prisoners possessed a

22

right to the privacy of their medical records. I proceed to my conclusion as follows:

First, we have recognized the right to confidentiality in medical records since 1980. United States v. Westinghouse Elec. Corp., 638 F.2d 570, 577 (3d Cir. 1980). We stated in Westinghouse that medical records, which "may contain intimate facts of a personal nature, are well within the ambit of materials entitled to privacy protection. Information about one's body and state of health is a matter which the individual is ordinarily entitled to retain within the private enclave where he may lead a private life." Id. at 577 (citations omitted). Those infected with HIV are often subjected to discrimination, ridicule, and violence, and therefore by 1995 we recognized the heightened importance of respecting the medical privacy of HIV carriers. See Doe v. Southeastern Pennsylvania Transp. Auth., 72 F.3d 1133, 1140 (3d Cir. 1995) (noting not only the importance of maintaining the privacy of medical records but also the corollary responsibility of maintaining the confidentiality of prescriptions for medications used to treat AIDS.); see also Doe v. City of New York, 15 F.3d 264 (2d Cir. 1994); Doe v. Borough of Barrington, 729 F. Supp. 376 (D.N.J. 1990). Thus the constitutional right to privacy of medical information in the non-prison context was well established at the time the defendants here "leaked" the information about Doe.

Likewise, the standard for determining the legitimacy of an infringement on a prisoner's constitutional right, such as the right to confidentiality in medical records, was well established by 1995. In Turner, 482 U.S. at 89, 107 S.Ct. at 2257, the Supreme Court determined that any alleged violation of a prisoner's right will be unwarranted unless it is determined to be "reasonably related to legitimate penological interests." See also Washington v. Harper, 494 U.S. 210, 110 S.Ct. 1028 (1990); O'Lone v. Estate of Shabazz, 482 U.S. 342, 107 S.Ct. 2400 (1987); Monmouth County Corr. Inst. v. Lanzara, 834 F.2d 326, 343 (3d Cir. 1987). Turner provided four questions to guide our analysis. First, is there a valid and rational connection between the regulation or activity and the legitimate governmental interest? Second, is there an alternative means for the

23

prisoner to exercise the right? Third, will accommodating the right cause an unreasonable burden on the staff, other inmates, or prison resources? Fourth, is there another obvious means to accomplish the prison's objective? The Court's intention in fashioning this test was "to formulate a standard of review for prisoners' constitutional claims that is responsive both to the policy of judicial restraint regarding prisoner complaints and [to] the need to protect constitutional rights." Turner, 482 U.S. at 89, 107 S.Ct. at 2257 (citations omitted).

Although we have given "[p]rison officials . . . broad discretion in fashioning appropriate r esponses to legitimate penological objectives consistent with the constitutional rights of inmates," Monmouth County, 834 F.2d at 343, Turner demands that the responses at issue reasonably serve a valid penological interest. The courts must not, therefore, allow our analysis to be obscur ed by bald assertions from prison officials who claim that the policy in question serves a legitimate end. Expressing some frustration that the Turner standar d was being misapplied, the Supreme Court restated its purpose and application in Washington v. Harper, 494 U.S. 210, 110 S.Ct. 1028 (1990). "We made quite clear," Justice Kennedy admonished, "that the standard of review we adopted in Turner applies to all circumstances in which the needs of prison administration implicate constitutional rights." Id. at 223, 110 S.Ct. at 1038.

Well before 1995, therefore, officials for the Pennsylvania Department of Corrections should have known 1) that a constitutional right to privacy in medical r ecords exists, particularly for HIV-related infor mation, and 2) that under Turner, prisoners do not forfeit constitutional rights except when those rights cannot reasonably be r econciled with legitimate penological objectives. With these two premises well known, I would expect reasonable prison officials to infer that they cannot arbitrarily violate a prisoner's right to privacy in medical information. In this situation, the "contours of the right [were] sufficiently clear" for Appellees to understand that they were violating Doe's constitutionally protected right. Anderson , 483 U.S. at 640, 107 S.Ct. at 3039.

24

Next, I believe that a "consensus of cases of persuasive authority" had been established by 1995. W ilson v. Lane, 526 U.S. 603, 616, 119 S.Ct. 1692, 1700 (1999). The Eleventh Circuit Court of Appeals had pr esumed the existence of the right to privacy in HIV-r elated medical information for prisoners by 1991. See Harris v. Thigpen, 941 F.2d 1495 (11th Cir. 1991). Likewise, in 1992 the Court of Appeals for the Fifth Circuit r eviewed segregation of HIV-positive inmates under the Tur ner test, finding that the identification and segregation of HIV -positive prisoners "obviously serves a legitimate penological inter est," and thereby acknowledging the existence of a prisoner's right to privacy in medical information that can only be abrogated by a legitimate penological objective. Moor e v. Mabus, 976 F.2d 268, 271 (5th Cir. 1992).

In 1993, the Eastern District of Pennsylvania held that inmates have a constitutionally protected privacy interest in nondisclosure of confidential medical infor mation concerning their HIV status. Faison v. Parker, 823 F. Supp. 1198 (E.D. Pa. 1993). Although the court recognized this right, it ultimately held that the disclosur e of such information in a presentencing report served the state's compelling and countervailing interest of utilizing this knowledge to provide an appropriate sentence and care regimen. The balance of interests favor ed disclosure because the medical information was not included in the public record, was treated as confidential, and was provided only to the appropriate officials. Thus, by 1993 the Eastern District of Pennsylvania recognized the right to privacy in inmates' HIV-related medical information and further understood that this right could be compr omised only by the need to meet a compelling and incompatible government interest. The Eastern District of Pennsylvania reinforced this ruling in Austin v. Pennsylvania Dept. of Corr., 876 F. Supp. 1437 (E.D. Pa. 1995), which I will discuss in more detail below.

A series of other District Courts reached the same conclusion by 1995. Clarkson v. Coughlin, 898 F. Supp. 1019, 1041 (S.D.N.Y. 1995) ("Prison inmates retain a constitutional right to privacy concerning medical information about them."); Nolley v. County of Erie, 802 F.

Supp. 898 (W.D.N.Y. 1992); Inmates of N.Y. State with Human Immune Deficiency Virus v. Cuomo, No. 90-CV-252, 1991 WL 16032, *3 (N.D.N.Y. Feb. 7, 1991)("[T]he federal Constitution protects against the unwarranted and indiscriminate disclosure of the identity of HIV-infected individuals and of their medical records; that is to say, the court accepts . . . the proposition that the constitutional right of privacy extends to such matters, and that prisoners enjoy such a privacy right. . . ."); Bor ough of Barrington, 729 F.Supp. at 384 ("The government's interest in disclosure here does not outweigh the substantial privacy interest involved. The government has not shown a compelling state interest in breaching the Does' privacy."); Woods v. White, 689 F. Supp. 874 (W.D. Wis. 1988), aff 'd without opinion, 899 F.2d 17 (7th Cir . 1990);1 Rodriguez v. Coughlin, No. 87 Civ. 1577E, 1989 WL 59607 (W .D.N.Y. June 2, 1989); Doe v. Coughlin, 697 F . Supp. 1234, 1238 (N.D.N.Y. 1988) ("[I]n recognition of the particularly personal nature of the information potentially subject to disclosure under the state's program, the court determines that the prisoners subject to this program must be afforded at least some protection against the non-consensual disclosure of their diagnosis.")

Appellees argue, and Judge Roth agrees, that these cases do not constitute a proper consensus. T o the contrary, I agree with the Court of Appeals for the Eighth Circuit, which explained that "[i]n the absence of binding precedent, a court should look to all available decisional law, including decisions of state courts, other circuits and district courts." Norfleet v. Arkansas Dep't of Human Services , 989 F.2d 289, 291 (8th Cir. 1993); see also Buckley v. Rogerson, 133 F.3d 1125, 1129-30 (8th Cir. 1998) (finding a right clearly established on the basis of decisions from out of circuit district courts). We should remember that the Supreme Court has recently made clear that all that is required to defeat claims of qualified immunity is a "consensus of cases of persuasive authority," and not a consensus of binding authority. Wilson, 526 U.S. at 616. Thus although a lone

_____

1. Judge Roth states that the Seventh Circuit "rejected" Woodsin Anderson v. Romero, 72, F.3d 518 (7th Cir. 1995). This is not entirely accurate. The court in Anderson merely declined to reach the question.

26

District Court opinion may not secure a right, when that opinion is combined with opinions from the Supr eme Court, Courts of Appeals, and a variety of District Courts, then I would conclude that the right was established to an extent sufficient to notify the officials.

Two other factors render the officials' failure to recognize Doe's right to privacy in his medical recor ds still more unreasonable. First, The Pennsylvania Confidentiality of HIV-Related Information Act, 35 P .S. S 7603, which became effective on March 1, 1991, provides a statutory right to nondisclosure. Section 7607 states:

> (a) Limitations on disclosure.--No person or employee, or agent of such person, who obtains confidential HIV-related information in the course of pr oviding any health or social service or pursuant to a release of confidential HIV-related information under subsection (c) may disclose or be compelled to disclose the information.

The statute makes no exception for inmates, as it states that HIV-related information can be disclosed to

> [e]mployees of county mental health/mental retardation agencies, county childr en and youth agencies, county juvenile probation departments, county or State facilities for delinquent youth, and contracted residential providers of the above-named entities receiving or contemplating residential placement of the subject, who:
>
> (i) generally are authorized to receive medical information; and
>
> (ii) are responsible for ensuring that the subject receives appropriate health care; and
>
> (iii) have a need to know the HIV-r elated information in order to ensure such care is pr ovided.

Id. Because no exception is made for adult prisoners, and all other exceptions are clearly stated, the Department of Corrections should have known by March 1991 that prisoners possess a right to the privacy of their HIV-related information. Considering the specificity of the statute, and

27

its precise applicability to the facts of this case, the right under review was clearly established in 1991.

Appellees, and Judge Roth, claim that a state statute is irrelevant to the issue of qualified immunity on a federal claim. See Davis v. Scherer, 468 U.S. 183, 194-97, 104 S.Ct. 3012, 3019-21 (1984). I disagree. As the Supreme court explained in Elder v. Halloway, Davis held that

> an official's clear violation of a state administrative regulation does not allow a S 1983 plaintiff to overcome the official's qualified immunity. Only in this context is the Court's statement comprehensible: `A plaintiff who seeks damages for violation of constitutional or statutory rights may overcome the appellee official's qualified immunity only by showing that those rights were clearly established . . .' Davis, in short, concerned not the authorities a court may consider in determining qualified immunity, but this entirely discrete question: Is qualified immunity defeated where an appellee violates any clearly established duty, including one under state law, or must the clearly established right be the federal right on which the claim for relief is based? The Court held the latter.

510 U.S. 510, 515, 114 S.Ct. 1019, 1023 (1994) (citations omitted).

The reason why I disagree with Judge Roth is that although a state statute will not, by itself, place an official on notice of a federal right, to me such a statutory right should raise the official's awareness that a parallel federal right may exist. Such a warning should facilitate a reasonable official's ability to make the inference discussed above. This position is congruent with the objectives of the doctrine of qualified immunity. If a state statute clearly articulates a right, and places those within its jurisdiction on notice of that right, and if that right per fectly coincides with a federally protected right, then why would we not consider the statute's existence when determining whether the offender should have known of the federal right? I think we should. Indeed it seems to me that a state statute, locally promulgated, and free from many of the uncertainties of case law, most effectively notifies the community of a protected right, and reinforces federal law.

28

Regardless of how a person learned of the right, and regardless of whether she thought she was violating state or federal law, she knew that a right existed and that she was violating it. The purpose of qualified immunity is to protect government officials fr om having to defend themselves in litigation over rights and duties that they did not know they were violating. Here, the Appellees were clearly notified by the 1991 statute that Doe was entitled to the privacy of his medical records under state law. The inference that prisoners were entitled to the same right under federal law was implicit by 1995. If we allow the state statute to play no role in assessing whether or not the officials should have known of the federal right, then we allow officials to turn a blind eye to the general state of the law and discourage them from making a good faith effort to recognize such implicit principles. I consider this good faith effort to be within the responsibilities of a "reasonable official."

In addition, as powerful evidence that these officials knew they were violating Doe's right to privacy, in an opinion establishing a right to privacy for inmates' HIV–related medical records, Austin v. Pennsylvanian Dep't of Corr., the very agency and officials before us now were also appellees in that case. In that opinion in January 1995, the Court stated that the "DOC has agreed to keep inmates' medical information regarding HIV status confidential and to advocate a universal precautions policy in place of the current Contagious Disease Notification Policy in its forthcoming negotiations with the union repr esentative of its custody staff." Austin, 876 F . Supp. at 1453. This decision alone directly notified Appellees of their obligation to protect Doe's privacy right. As Judge Roth correctly states, court approval of a settlement does not provide a legal decision regarding the constitutionality of the elements of the settlement. But that is not the test. The court clearly warned the very institution before us in this matter that it risked constitutional violations by disclosure. Indeed the language the Court used was that disclosure of a prisoner's HIV–related medical infor mation, if "unrelated to any penological interest . . . would most likely violate state law, and the Constitution of the United States." Id. at 1437. Austin explained that "[a]lthough individuals have an

interest in preventing disclosure of their HIV status which is protected by state law and the Constitution, inmates' rights must necessarily yield to a certain extent to legitimate penological interests," and then clearly stated the criterion of the Turner test. Id.  In light of this notification, it seems disingenuous to claim that the officials here deserve protection from Doe's claims because they did not know that they could not arbitrarily disclose a prisoner's medical information.2

     In summary, the combination of the preponderance of case law, the state statute, and the Pennsylvania Department of Corrections' previous agr eement to respect privacy in prisoners' HIV-related materials, clearly established the right in question. I would find that, taken together, these factors defeat Appellees' claim to qualified immunity. I therefore respectfully dissent from this aspect of the Majority's decision.

_____

2. Finally, I note that the manner in which this delicate information was disseminated indicates to me that the officials knew they were misbehaving, but persisted in doing so regar dless of the fact that they were mistreating Doe.

GARTH, Circuit Judge, dissenting and concurring.

I agree with Judge Roth that the District Court's decision dismissing Doe's complaint should be affir med because the defendants have qualified immunity from Doe's claims. However, I cannot agree that, on this r ecord brought before us on a Rule 12(b)(6) motion,1 we can or should declare that "a constitutional right to privacy in one's medical information exists in prison." (Roth Op. at 11.) This case is one of first impression, and Judge Roth's holding, with which Judge Nygaard concurs as to the constitutional right,2 may have a multitude of ramifications in this Cir cuit where major prisons abound. It is for that reason that I write separately contesting the creation of a constitutional right of privacy and confidentiality for prisoners. 3

It is true that, in so holding, Judge Roth qualifies this statement, observing that "Doe's constitutional right is subject to substantial restrictions and limitations in order

_____

1. A motion brought pursuant to Federal Rule of Civil Procedure 12(b)(6) is granted only if: "taking the allegations of the complaint as true, . . . and viewing them liberally giving plaintiffs the benefit of all inferences which fairly may be drawn therefrom, . . .`it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief.' "Bogosian v. Gulf Oil Corp., 561 F.2d 434, 444 (3d Cir. 1977) (internal citations omitted).

2. For ease of reference, I will r efer to Judge Roth's holding throughout this dissent and concurrence, although Judge Nygaard constitutes her majority with respect to the establishment of a constitutional right to privacy in prison.

3. In her footnote 3, relevant to her discussion of mootness, (see Roth Op., Part III.A), Judge Roth asserts that S 1997e(e) of the Prison Litigation Reform Act ("PLRA") does not bar claims for punitive damages, relying on Allah v. Al-Hafeez, 226 F .3d 247, 251 (3d Cir. 2000). I disagree with her analysis, because I believe that this case is far more similar to Davis v. District of Columbia, 158 F.3d 1342 (D.C.Cir. 1998), where the D.C. Circuit held that an inmate's punitive damages claims were barred by the PLRA. We distinguished Davis in Allah "because those claims [in Davis] stemmed fr om the allegations of emotional and mental injury [suffered as a r esult of the violation of Davis' constitutional right to privacy]." 226 F.3d at 252. As a consequence, contrary to Judge Roth, I would hold that Doe's punitive damages claim is barred by the PLRA, although I agree that the claim for nominal damages prevents our dismissing Doe's action as moot.

for correctional officers to achieve legitimate correctional goals and maintain institutional security." (Roth Op. at 11.) Nevertheless, because she and I agree that such a constitutional right of privacy in prison has not been and is not clearly established, the prudential and wiser course of action in this case is to decline to determine that such a constitutional right has been established at all .

I.

The record before us in this case is naked of anything other than Doe's allegations in his complaint--allegations which complain of a lack of privacy and confidentiality as well as a violation of his grievance/appeal rights. 4 However,

_____

4. That statement of Doe's claim alleges:

- Doe is a death row prisoner;

- After submitting to a blood test, Doe was informed by the prison medical staff that he was HIV-positive and that this medical condition would be kept confidential;

- He has undergone medical examinations and tests in the open presence of correctional officers and other inmates;

- The clinic door is kept open when Doe is seen by doctors and specialists from the Centers for Disease Contr ol (CDC), so that correctional officers can see Doe;

- When Doe has an appointment with a CDC specialist, the correctional officers who escort him to the appointment are informed of the nature of the appointment;

- On one occasion, a nurse announced aloud the names of the medications being delivered to Doe in the pr esence of other inmates and that nurse told a corrections officer about Doe's condition;

- In connection with Doe's internal grievance about the sick call procedure, he was interviewed by a medical grievance officer whom Doe told that another inmate twice over heard a nurse stating the name of Doe's medication when delivering it to him;

- Doe's internal grievance, which contained information about his HIV-positive status, was forwarded to the superintendent of the prison;

32

we have not been informed and do not know whether Doe, who was a death penalty prisoner, was r equired to be closely guarded at all times by prison guar ds, thereby virtually ensuring that the guards would be privy even to private conversations. We do not know the construction and dimensions of the medical area or medication dispensary at SCI–Pittsburgh––whether there ar e communal examination rooms or private examination cubicles. W e do not know the location of Doe's death penalty cell in the Restricted Housing Unit ("RHU"), or the route, access, and distance from his cell to the medical area. W e do not know the circumstances under which medication is dispensed at sick call––the structure and configuration of the dispensary, the location in the dispensary of physicians, nurses, guards, and other prisoners, or the manner in which prisoners receive medication (are they separately scheduled or are they scheduled in a group or in an open line?). Nor do we know the administrative complexities encounter ed by prison authorities in ensuring the manner in which each prisoner receives the correct medication. We do not know the state of the security precautions in the dispensary area as compared to the security in the RHU, nor do we know the required provisions for security in the passageways between the two areas.

All that we do know from Doe's complaint is 1) that the clinic door is kept open when Doe is seen by doctors and CDC specialists so that Doe may be viewed by corr ections officers,5 and 2) that, when Doe receives his medication, the medication is sometimes referred to by name. Moreover,

_____

> – Prison officials responded to Doe's internal grievance by informing him that the nurses denied his allegations and that the door had to be left open when Doe was being examined by specialists and doctors due to a "security issue"; and

> – His appeal rights had been affected by being obliged to go through the superintendent prior to appeal tofinal review.

(App. 15a–19a.)

5. Judge Roth acknowledges that Doe has conceded that this practice may be justified by the prison's legitimate security concerns. (Roth Op. at 12.)

33

because, on a Rule 12(b)(6) motion, no response or information is available from, in this case, the prison authorities, we have no knowledge of the physical, structural, or security conditions in prison that contribute to and may generate a diminished expectation of privacy or confidentiality.6

Prisons are communal environments in which a large number of inmates and prison employees coexist in a confined living space. For this reason, inmates have little physical privacy, and the circumstances of medical treatment may not conform to private, non-prison norms. Prisoners must do everything in close proximity to other inmates and prison personnel, including sleeping, eating, dressing, bathing, and, to a certain extent, r eceiving medical attention.

II.

Another reality of prison life is the fact that prison

_____

6. Because, as noted, this is an appeal fr om a Rule 12(b)(6) dismissal, the defendants have not been able to inform us of their actions, procedures, regulations, explanations, or justifications in response to Doe's complaint. (See text infra, discussing the inadvisability of creating
constitutional rights based on a naked recor d consisting only of the prisoner-plaintiff 's allegations.) It is not only impossible to analyze the
factors identified in Turner (connection between regulation and justification; alternative means of exer cising right; costs of accommodating right; and alternatives to the r egulation), as even Judge Roth acknowledges (see Roth Op. at 12 ("defendants did not have the opportunity to [produce] any evidence of legitimate penological interests, costs. . . , or availability of alternatives. . .")), but it is similarly hopeless
to draw upon instruction from the "privacy?" cases cited by both Judge Roth and Judge Nygaard. This is so because, her e, there are no factual circumstances that can be likened or compar ed to the circumstances described in the cases my colleagues have cited, almost all of which are non-prison cases or are inapposite for some other reason and, therefore, are not relevant in any event. See, e.g., Doe v. Southeastern Pennsylvania Transp. Auth., 72 F3d 1133 (3d Cir . 1995) (non-prison case); United States v. Westinghouse Elec. Corp., 638 F .2d 570 (3d Cir. 1980) (non-prison case); Moore v. Mabus, 976 F .2d 268 (5th Cir. 1992) (does not establish privacy right); Harris v. Thigpen, 941 F.2d 1495 (11th Cir. 1991) (does not establish privacy right).

34

resources are limited. Prison systems are generally in this day and age overcrowded and understaf fed. Therefore, accommodation of prisoners' privacy and confidentiality demands, their needs, and even their rights cannot be assumed or declared in a vacuum. Considering the communal nature of prison existence, similar in many privacy (or lack of privacy) aspects to life in the military, together with the limited and often insufficientfinancial resources of prisons, I believe it to be rash and imprudent to hold at this time, without much more infor mation about prison security concerns, that Doe has a constitutional right to privacy in his HIV-positive status, any more than he has a constitutional right of privacy in his cell. See Hudson v. Palmer, 468 U.S. 517, 525-26 (1984).

I recognize, of course, that the rationale of Hudson, analyzed under the Fourth Amendment, dealt with the lack of privacy an inmate has in his cell accommodation, whereas here our attention is drawn to rights under the Fourteenth Amendment and the "penumbras" of rights encompassing privacy. See Griswold v. Connecticut, 381 U.S. 479, 484 (1965) (holding that "specific guarantees in the Bill of Rights have penumbras," one of which is the right of privacy). However, certainly Doe's expectation of privacy and confidentiality of medical infor mation in a communal dispensary setting cannot be deemed to be greater than his expectation of privacy in his cell, depending, of course, on all of the circumstances which I have noted above and as to which we have no infor mation.

Indeed, I take issue with Judge Roth's assertion that "Doe's asserted right to privacy in his medical information is completely different than the right extinguished in Hudson." (Roth Op. at 10.) After all, in Hudson, the Supreme Court declined to declare a constitutional right because "[t]he recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions," 468 U.S. at 526, wher eas, here, Judge Roth has declared a constitutional right, but has held that "Doe's constitutional right is subject to substantial restrictions and limitations in order for correctional officials to achieve legitimate correctional goals and maintain

35

institutional security." (Roth Op. at 11.) If there are concerns, as evidently Judge Roth has her e, that "legitimate correctional goals" and "institutional security" may be jeopardized by the exercise of Doe's purported constitutional right, it would seem to me only prudent that we should withhold declaring a constitutional right of privacy until we have obtained the information we lack.

That is the course of action that the Supreme Court took in Hudson, where the Court decided the very limited question of a prisoner's Fourth Amendment privacy right in his cell on an appeal from a grant of summary judgment, not a Federal Rule of Civil Procedure 12(b)(6) motion, and even Powell v. Schriver, 175 F.3d 107 (2d Cir. 1999), which Judge Roth cites in support of her declared constitutional right, went to full trial before the Second Cir cuit announced that a constitutional right had been established.

I believe that we can analogize Doe's situation to the Supreme Court's rationale in Hudson, where the Court, as noted, held that prisoners do not have a Fourth Amendment right to privacy in their cells. Doe's complaint includes claims of violation of his privacy, violation of confidentiality, and violation of his rights under the grievances and appeal procedures. My r eading of Doe's complaint reveals that it is the privacy aspect on which Doe has focused and which has caused his distress. But, the question that then arises is whether Doe had a legitimate expectation of privacy concerning his HIV –positive status. In this respect, I believe we can look to Hudson, where the Court stated:

> Determining whether an expectation of privacy is "legitimate" or "reasonable" necessarily entails a balancing of interests. The two inter ests here are the interest of society in the security of its penal institutions and the interest of the prisoner in privacy within his cell. The latter interest, of course, is already limited by the exigencies of the circumstances: A prison "shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room." We strike the balance in favor of institutional security, which we have noted is "central to all other corrections goals." A right of privacy in traditional Fourth Amendment terms

36

> is fundamentally incompatible with the close and
> continual surveillance of inmates and their cells r equired
> to ensure institutional security and inter nal order. We
> are satisfied that society would insist that the
> prisoner's expectation of privacy always yield to what
> must be considered the paramount interest in
> institutional security. We believe that it is accepted by
> our society that "[l]oss of freedom of choice and privacy
> are inherent incidents of confinement."

Hudson, 468 U.S. at 527–28 (internal citations omitted) (emphasis added). So too is the privacy inter est implicated in this case "limited by the exigencies of the circumstances," namely the communal natur e of prison life, the logistical problems with prisoner confidentiality in prison medical facilities, and the need for prisoners, especially death row prisoners such as Doe, to be watched closely by prison guards. Therefor e, I believe that, depending upon the prison information as to which we are still ignorant, Doe's right to privacy in the communication of his medical information may be "fundamentally incompatible with the close and continual surveillance of inmates" as was the Fourth Amendment right in Hudson.7

_____

7. I should note that the connection between the prison's security interest and the deprivation of Doe's right to privacy is less direct here than in the Fourth Amendment context. In Hudson , the Supreme Court observed that prison officials must be able to maintain prison safety by entering inmate's cells to search for weapons and contraband. Here, Doe's right to privacy is overshadowed and diminished by the general need to monitor and guard prisoners and by the very nature of a forced communal living environment, both of which make it difficult to preserve a prisoner's privacy.

Moreover, I believe that the balancing of interests prescribed by the Supreme Court in Hudson whereby expectations of privacy must be balanced against legitimate penological and security interests cannot be undertaken unless and until those interests ar e known and spread upon the record. Until that time, I cannot subscribe to or hold that prisoners have the same privacy interests as the general non-prison population enjoys. I also believe that, when the balancing equation is completed, it will weigh in favor of institutional security and against prisoners' unrealistic expectations of privacy as it does in the Fourth Amendment context.

37

See Pell v. Procunier, 417 U.S. 817, 822 (1974) ("challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in ter ms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law").

Thus, the realities of prison life compel a holding that Doe has not established a constitutional right to privacy on the record here--and certainly not in the current posture of this case. Though the Supreme Court has held that prisoners retain "those [constitutional] rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration," Hudson v. Palmer, 468 U.S. 517, 523 (1984), the Court has also observed repeatedly that "[l]awful incar ceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." 8 Price v. Johnston, 334 U.S. 266, 285 (1948). These "considerations" include "deterrence of crime, rehabilitation of prisoners, and institutional security," DeHart v. Hor n, 227 F.3d 47, 50 (3d Cir. 2000), as well as, I believe, allocation of limited prison resources. Indeed, the Supr eme Court has stated: "because the `problems of prisons in America are complex and intractable,' and because courts are particularly `ill equipped' to deal with these problems, we generally have

_____

Hence, I am neither influenced nor persuaded by Judge Roth's reliance on Powell v. Schriver, 175 F.3d 107 (2d Cir. 1999), a Second Circuit case not binding in this Circuit and completely distinguishable because: 1) Powell was decided only after a full jury trial, whereas here we have a Rule 12(b)(6) motion which takes the allegations of the complaint as true, see note 1, supra; 2) Powell extrapolated its privacy holding from Doe v. City of New York, 15 F.3d 264 (2d Cir. 1994), which is a non-prison case of privacy; and 3) Powell's emphasis was wholly on transsexualism--a condition with its unique pr oblems not relevant in Doe's case.

8. The Supreme Court reaffirmed this principle most recently in Shaw v. Murphy, stating that "constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large." 121 S.Ct. 1475, 1479 (2001).

38

deferred to the judgments of prison officials in upholding these regulations against constitutional challenge." Shaw v. Murphy, 121 S.Ct. 1475, 1480 (2001) (inter nal citations omitted) (holding that a prisoner has no First Amendment right to provide legal assistance to other inmates and that, therefore, prison officials did not violate the prisoner's constitutional rights when they intercepted a letter containing legal advice that he sent to another prisoner).

III.

I also note that a decision in this case that 1) the record is not sufficient to establish a constitutional right but that 2) the right was not clearly established in any event is consistent with the Supreme Court's dir ective in Wilson v. Layne, 526 U.S. 603 (1999). In Wilson , the Court stated that "[a] court evaluating a claim of qualified immunity `must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.' " 526 U.S. 603, 609 (1999) (quoting Conn v. Gabbert, 526 U.S. 286, 290 (1999)). The Court explained that "[d]eciding the constitutional question before addressing the qualified immunity question . . . promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." 526 U.S. at 609.

However, Wilson arose in the context of a district court's ruling on a summary judgment motion, not on a Rule 12(b)(6) motion to dismiss, as did the other cases cited by the Court in Wilson. See Conn v. Gabbert, 526 U.S. 286 (1999); County of Sacramento v. Lewis, 523 U.S. 833 (1998); see also Siegert v. Gilley, 500 U.S. 226 (1991).9 This doctrine makes sense in the context of a summary

_____

9. Powell v. Schriver, see note 5, supra, in which the Second Circuit held that a transsexual prisoner had a constitutional right to privacy in that medical information but that the constitutional right to privacy in prison was not clearly established, arose in the context of a district court's grant of judgment notwithstanding the verdict to the defendant. In that case, unlike this one, the Second Circuit had the benefit of a full factual
record after a full jury trial.

39

judgment motion, which occurs at the close of discovery when a court may make a decision on the existence of a constitutional right with the benefit of the r elevant facts.

Hence, it seems to me that the Wilson rule is not appropriately extended to rulings on Rule 12(b)(6) motions to dismiss, where the factual recor d is as scant as it is here. In my opinion, to construct a constitutional right out of the whole cloth without analysis and without any knowledge of the institutional factors or security concerns attendant to a prison population or to a penal envir onment appears to me to be not only improvident but, as I have stated, rash. Indeed, I find it highly unusual that a court should decide the existence of a constitutional right when it has essentially no record befor e it and no basis on which it may balance the claims made by the prisoner of privacy expectations against legitimate security inter ests of the prison. Such a decision does not "promote[ ] clarity in the legal standards for official conduct, to the benefit of both the officers and the general public," W ilson, 526 U.S. at 609, but instead causes uncertainty and confusion by establishing an hitherto undeclared constitutional right with no discernable standards.

Judge Roth in her majority opinion has responded to this critique and my thesis by citing two Supreme Court cases and declaring that the Supreme Court unequivocally demands that, in qualified immunity cases, the constitutional right first be declared befor e we address whether that right has been clearly established. (Roth Op. at 8 n.4.) I quite agree with her that the doctrine she invokes requires the declaration of a constitutional right as the first order of business. However, and this is a major "however," those cases to which she r efers were not cases decided by a district court on a Rule 12(b)(6) motion. See Wilson v. Layne, 526 U.S. 603, 608 (1999) ("The District Court denied respondents' motion for summary judgment on the basis of qualified immunity."); Conn v. Gabbert, 526 U.S. 286, 289 (1999) ("[Defendants] moved for summary judgment on the basis of qualified immunity, and the District Court granted the motion."). The very nature of a Rule 12(b)(6) motion, as contrasted with a summary judgment motion, with its concomitant standar d of review

40

(accepting all of the plaintiff 's allegations as true), is alien to certain types of judicial declarations (namely, declarations of constitutional rights).

The Seventh Circuit, albeit in a differ ent context, has recently held that district court judges should not apply the Rule 12(b)(6) standard of accepting a plaintif f 's allegations as true when they determine whether to certify a class. The Seventh Circuit instructed that, "[b]efore deciding whether to allow a case to proceed as a class action, .. . a judge should make whatever factual and legal inquiries ar e necessary under Rule 23." Szabo v. Bridgeport Machines, Inc., 249 F.3d 672 (7th Cir. 2001). Similarly, I suggest that the Rule 12(b)(6) standard cannot be applied by district courts in first determining the existence of a constitutional right, because the facts and circumstances of the case, as they bear upon penological interests and concer ns, must be explored before a court can unequivocally announce a constitutional right.

Moreover, I have great difficulty, as I envisage the bench and bar will also have, in identifying the contours and parameters of an asserted constitutional right of prison privacy that is still subject to the restrictions and limitations of penal security interests. Even Judge Roth admits that these restrictions, limitations, and accommodations have yet to be delineated. In particular, since the relevant penological interests are presently not known and may, by their very nature, cause the constitutional right at issue here to disappear into thin air or be diminished to a point of nothingness, it seems to me far better that we know precisely the right with which we are dealing before creating such a right liable to be dismissed on its first documented challenge.

Certainly the Supreme Court could never have intended that a fundamental constitutional right be cr eated with no regard for the framework or circumstances relevant to its application. It is for that reason, I suggest and strongly urge, that it is far more prudent and r esponsible to await the development of an appropriate recor d before plunging ahead to create a fundamental right which may not ever be sustainable in a communal prison context.

Judge Roth acknowledges that the record in this case is undeveloped just as Doe himself "concedes that the `open door' examination room policy [see note 3, supra] could conceivably be justified by a legitimate security interest but contends that no such interest has been advanced here." (Roth Op. at 12.) Judge Roth, recognizing that we would ordinarily remand for consideration by the trial court of issues concerning legitimate penological inter ests, security concerns, costs of accommodating Doe's privacy interest, availability of alternatives, etc., did not take that course because the right which she has declared was not clearly established.

I would hold that, if a record is undeveloped, as this one is, it cannot suffice to form the basis for the declaration of a constitutional right. The announcement of a constitutional right––an announcement which is never lightly reached and which inevitably has far -reaching and unpredictable consequences––should be gr ounded on unassailable legal principles and formulated based on a full factual record. Had Judge Roth just assumed arguendo that a constitutional right existed in prison, as the Eleventh Circuit did in Harris v. Thigpen, 941 F .2d 1495, 1513 (11th Cir. 1991), (which was admittedly decided before the Supreme Court's holding in Wilson v. Layne, 526 U.S. 603 (1999)), while I would have been uncomfortable, I would not have resisted her announcement as I have. But, to announce without reservation a full-fledged constitutional right of privacy in prison, as a matter of first impression, without a factual record, and without any substantial or persuasive case support, I believe transcends our r ole as reviewing judges. I think the declaration made in this case is wrong and is a grave mistake to publish as this Circuit's precedent. I think that we will ultimatelyfind it necessary to retreat from the constitutional position this panel has taken.

IV.

Accordingly, in my opinion, we are corr ect in disposing of this case on qualified immunity grounds, not only because the constitutional right was not clearly established but because, at this time and in the posture of the present

42

case, we should not announce a constitutional right which cannot be defined at this stage of the proceedings.

I therefore respectfully dissent fr om Judge Roth's constitutional holding but concur in the final judgment, because I agree with Judge Roth that such a right has not been, and is not, clearly established and that, ther efore, the District Court's dismissal of Doe's action should be affirmed.

A True Copy:
Teste:

    Clerk of the United States Court of Appeals
    for the Third Circuit

43