GARTH, Circuit Judge,
dissenting and concurring:
The issue that has divided this panel and which should concern every judge, every police officer and every official who claims qualified immunity by virtue of his or her office is: how do we determine the second prong of the qualified immunity doctrine— ie., when is the constitutional right which is claimed to have been violated clearly established so as to visit liability on the official?
*220 Distressingly, the majority opinion fails to announce a standard by which the bench and the bar can test whether a particular legal principle — that is the particular constitutional right — is “dearly established” for purposes of qualified immunity. I strongly urge that in deciding this second prong, at the least a balancing process should be undertaken whereby the factors to be balanced are:
(1) Was the particular right which was alleged to have been violated specifically defined, or did it have to be constructed or gleaned from analogous general precepts? See Wilson v. Layne, 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999).
(2) Has that particular right ever been discussed or announced by either the Supreme Court or by this Circuit?
(3) If neither the Supreme Court nor this Circuit has pronounced such a right, have there been persuasive appellate decisions of other circuit courts — and by that I mean more than just one or two — so that the particular right could be said to be known generally?
(4) Were the circumstances under which such a right was announced of the nature that an official who claimed qualified immunity would have, acting objectively under pre-existing law, reasonably understood that his act or conduct was unlawful? [1]
Tested by these factors, it is clear to me that Officer Eberly, when he shot and killed the Brown’s Rottweiler which was unleashed, uncontrolled, barking and presenting an aggressive appearance, could not have reasonably understood that his act was unlawful. As such, he is entitled to qualified immunity and the District Court’s judgment should be affirmed.
I
I concede that it is not an easy task to determine when a right is dearly established. The precedents (with some exception), measured by the standard outlined above, would agree that breaking into a home without a warrant would offend Fourth Amendment rights. Accordingly, that right is dearly established. Similarly, the precedents would agree that inducing a coerced confession violates a defendant’s Fifth Amendment rights. Accordingly, that right is dearly established. By the same token, the precedents would agree that torturing a prison inmate violates the Eighth Amendment. Accordingly, that right is dearly established. But — I do not know of any precedent or any judge, other than the members of the majority, who can, responsibly hold that even if the Fourth Amendment is violated by a police officer shooting an unleashed, uncontrolled, barking Rottweiler which, as I point out in note 4 (infra), is an aggressive and possibly threatening large animal (certainly not a pussycat!), that such a right, if there is one, has been dearly established in any jurisdiction, let alone in this Circuit.
A. Specifically Defined
Can it really be held that the Fourth Amendment “seizure of property” right was readily and generally known to apply to the shooting of a Rottweiler which was loose on the street? Can we really say that this particular Fourth Amendment principle was defined with particular specificity and was therefore dearly established for purposes of qualified immunity? I am aware of no authority which defines the *221 principle with sufficient particularity so as to make it applicable to the situation here.
B.Lack of Binding Precedent
Can we really hold that the decisional law of the Supreme Court and this Court effectively equates the two concepts discussed above? Or — that Fourth Amendment principles of either court have at any time been applied to the shooting of an animal such as the Brown’s Rottweiler under the circumstances faced by Officer Eberly? The majority has furnished us with no such authority and I know of none.
C. Absence of Out of Circuit Authority
Well then, can we look at other appellate decisions that are relevant — if not on-point, at least near the point — and which are persuasive? As I explain later in referring to Lesher v. Reed, 12 F.3d 148, 150 (8th Cir.1994), and Fuller v. Vines, 36 F.3d 65 (9th Cir.1994) (see text at 224-225, infra), neither of those cases is relevant, neither case is on-point, neither case involves the same circumstances, and neither case can be applied here in the context of Officer Eberly’s actions. Needless to say, neither case is persuasive.
D. Pre Existing Law
Are there then cases under pre-existing law which would have or should have been known to Eberly, leading to his reasonable understanding that by shooting the dog which confronted him, he was doing something unlawful? If there are such cases, we have not been informed of them by the majority and I have not been able to find any.
II
In determining whether a legal principle is “clearly established,” if we cannot look to state law, as we cannot, see Doe v. Delie, 257 F.3d 309, 2001 WL 817680 (3d Cir. July 19, 2001) (“officials do not forfeit qualified immunity from suit for violation of a federal constitutional right because they failed to comply with a clear state statute.”) (citations omitted), and we cannot look to district court opinions or to other circuit pronouncements even if they are relevant (and those cited by the majority are not, see text at 224-225, infra), id., and we in the Third Circuit have never addressed this issue in the present context, then how can we possibly expect a police officer such as Eberly to understand that he would be violating a right that has never been specifically defined, let alone dearly established, in this or any other jurisdiction? As the majority opinion points out, citing to Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the “contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.” Id. at 640, 107 S.Ct. 3034; maj. op. at 211. That is to say that “in light of preexisting law, the unlawfulness must be apparent.” Anderson, 483 U.S. at 640, 107 S.Ct. 3034. How has the unlawful conduct of Officer Eberly, if indeed it was unlawful, been shown by the majority to be “apparent?” It is no answer, nor is it sufficient, to proclaim ipse dixit, as the majority has, “that Officer Eberly has not established that he is entitled to qualified immunity.” Maj. op. at 212.
The relevant focus has to be on the final part of the qualified immunity inquiry— whether the right allegedly violated was dearly established so that a reasonable official in Eberly’s position would understand that what he was doing violated that right. Anderson, 483 U.S. at 641, 107 S.Ct. 3034. If there has never been a constitutional right articulated that would prevent a police officer. from shooting a *222 barking, unleashed, uncontrolled dog such as the Rottweiler which was killed — as there has not been in this jurisdiction or any others — how can the absence of such a right as postulated by the majority constitute a dearly established right so as to hold Eberly liable?
In my opinion, the majority has erred in its unanalytic resolution of this issue, and its resolution should be rejected because it makes bad law in this case and in future cases where the dearly established element must be decided. Because there is no standard announced other than the one I have advanced, and there is no basis or authority supporting the “dearly established" holding of the majority, in my opinion, its holding here will dilute — if not destroy — the essential dearly established element announced by the Supreme Court in Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) and explained in Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).
Here, because the record establishes that Officer Eberly was qualifiedly immune when he shot the Browns’ Rottweiler, I would affirm the District Court’s judgment. Eberly’s immunity springs from the fact that even assuming a Fourth Amendment violation-an assumption bearing many serious concerns and one that carries a great deal of baggage under the circumstances here — there was no dearly established constitutional right that Eberly violated to warrant holding him liable-any more than there was a dearly established right that the majority concedes immunizes Eberly from the Brown’s substantive due process claim. See maj. op at 214, n. 6.[2]
Moreover, recognizing that in the qualified immunity context, the determination of whether Eberly’s actions were reasonable in the face of conflicting evidence can only be made by resort to affidavit and testimony supporting the Browns’ position, I conclude that Eberly’s actions were not only objectively reasonable for Fourth Amendment purposes, but did not, and could not, constitute an intentional infliction of emotional distress.
III
Pennsylvania law provides that “It shall be the duty of every police officer or state dog warden to seize and detain any licensed dog which is found running at large, either upon the public streets or highways of the Commonwealth, or upon the property of a person other than the owner of such dog, and unaccompanied by the owner or keeper." 3 P.S. § 459-302 (emphasis added). By statute it is provided that “Every police officer or state dog warden may kill any dog which is found *223 running at large and is deemed after due consideration by the police officer or state dog■ warden to constitute a threat to the public health and welfare.” 3 P.S. § 459-303 (emphasis added). Officer Eberly testified: “Because of the way [s]he was barking and growling at me, I perceived [her] as a threat to me, but I had a responsibility to do something to get this dog into custody as a police officer. That’s part of my responsibility for stray dogs.” A-394.
IV
Let me amplify my earlier analysis explaining the second prong — the clearly established prong — of the qualified immunity doctrine. Government officials “are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” Harlow, 457 U.S. at 818, 102 S.Ct. 2727; see also Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (observing that “all but the plainly incompetent or those who knowingly violate the law” are protected by qualified immunity). Whether a government official asserting qualified immunity may be held personally liable for conduct that allegedly violated a constitutional or statutory right depends on the “objective legal reasonableness” of the action. Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). As the Court explained, and as I have stated above:
The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has been previously held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

Id.

The Supreme Court has admonished that the particular right at issue must be defined with specificity. “[W]hat ‘clearly established’ means in this context depends largely upon the level of generality at which the relevant legal rule is to be identified.” Wilson v. Layne, 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (internal quotations and citation omitted). “It could plausibly be asserted that any violation of the Fourth Amendment is ‘clearly established ’ since it is clearly established that the protections of the Fourth Amendment apply to the actions of police.... However, ... the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established.” Id. at 615, 119 S.Ct. 1692 (emphasis added) (citations omitted). The Court in Wilson held that bringing the media into a private home to film the execution of a warrant violated the Fourth Amendment, but held that the right was not clearly established to warrant finding the officers liable for damages. The Court defined the specificity of the right as follows: “the appropriate question is objective inquiry of whether a reasonable officer could have believed that bringing members of the media into a home during the execution of an arrest warrant was lawful, in light of clearly established law and the information the officers possessed.” Id.
In the present case, the appropriate question is whether Officer Eberly as a reasonable officer could have perceived that the Rottweiler which was unleashed, uncontrolled, and running free on a public way and was barking at him, was a threat to him or to the public health and welfare. If so, as I believe all reasonable persons would agree, then his shooting the un *224 leashed, uncontrolled and barking Rottweiler was lawful.
As I have indicated, I am willing to assume a Fourth Amendment constitutional right (see n. 2, supra), but contrary to the majority, I cannot say that Eberly’s conduct in shooting an unleashed Rottweiler which any reasonable person would perceive as threatening and which was under the control of no owner and was barking, is clearly established as a constitutional violation in the Third Circuit. To the contrary, as I have earlier stated and as the majority must agree, my research has not revealed any Third Circuit precedent involving a police officer or other official who has ever been held liable or non-immune as a result of shooting an uncontrolled animal running freely on the public highway and which was perceived as being a threat to the public safety or to the officer. Nor have I found any out-of-circuit precedent that could be deemed as constituting clearly-established law and which could be said to have informed Officer Eberly that in shooting the Rottweiler he was violating the Browns’ Fourth Amendment rights.
In my view, even if non-circuit precedents existed, which they do not, such precedents are non-binding decisions which do not “clearly establish” law for purposes of qualified immunity. The Supreme Court has not defined the level of precedent required to render a right “clearly established.” Harlow, 457 U.S. at 818 n. 32, 102 S.Ct. 2727 (“we need not define here the circumstances under which the state of the law should be evaluated by reference to the opinions of this Court, of the Courts of Appeals, or of the local District.”).
Several courts, and most importantly the Third Circuit, have held that non-binding precedent does not make a right “clearly established.” See Doe v. Delie, 257 F.3d 309, 2001 WL 817680 (3d Cir. July 19, 2001) (holding that district court decisions did not render a right clearly established in the Third Circuit); Hansen v. Soldenwagner, 19 F.3d 573, 578 n. 6 (11th Cir.1994) (concluding that “the case law of one other circuit cannot settle the law in this circuit to the point of it being ‘clearly established.’ ”); Knight v. Mills, 836 F.2d 659, 668 (1st Cir.1987) (holding that decisions by two other circuits cannot create clearly established law when the Supreme Court had reserved the issue); Ohio Civ. Serv. Employees Ass’n v. Seiter, 858 F.2d 1171, 1177 (6th Cir.1988) (concluding that decisions of other circuits clearly establish the law only if they “both point unmistakably to the unconstitutionality of the conduct complained of and [are] so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting.”).
In Doe v. Delie, 257 F.3d 309 (3d Cir.2001), which found a constitutional right of privacy of a prison inmate’s medical information (a decision which I questioned, see id. (Garth, J., dissenting)), but then appropriately found that there was no clearly established right that was violated (a decision with which I agreed), we held that neither state nor out-of-circuit precedents could satisfy the clearly established element of the immunity doctrine. We did so because there was no authority to which we could look in any jurisdiction, including our own, whereby a prison official would understand that by prescribing a medication so that others might hear the prescription, the prisoner’s right to privacy had been violated. Just so here, where even if the Brown’s claimed constitutional right was confirmed, the majority opinion has not substantiated that it would have been apparent to a reasonable officer — in the circumstances present when the *225 Brown’s Rottweiler confronted Eberly— that shooting the Rottweiler would be unlawful.
Indeed, the only decisional law in our sister circuits is decisional law by the Eighth Circuit (Lesher) and by the Ninth Circuit (Fuller) involving dogs seized within the property of their respective owners — a far cry from an unleashed dog on the public street out of its owners’ control. These cases do not render the law clearly established in either the Eighth or Ninth Circuits, to say nothing of my own Circuit — the Third. Thus Officer Eberly is entitled to qualified immunity.
In Lesher v. Reed, 12 F.3d 148, 150 (8th Cir.1994), the government officials “removed [plaintiffs’] dog from their home.” Similarly, in Fuller v. Vines, 36 F.3d 65 (9th Cir.1994), the police officers killed plaintiffs’ dog in the plaintiffs yard. In neither case were the dogs running free and uncontrolled and in neither case was there a perception of a threat to the public safety. Here, in contrast, the Browns’ Rottweiler was outside their control, outside the Browns’ property, and unleashed and barking on the public street giving every appearance of a threat to public safety.
Officer Eberly saw the Browns’ Rottweiler running free without a leash obstructing traffic on Madison Avenue in Muhlenberg. Eberly parked his police car, exited, walked toward the dog and clapped his hands and called to her. The Rottweiler then barked at Eberly. One witness, Christopher Grim, testified that the Rottweiler “was getting ugly with the officer.... It was showing its teeth and barking and growling and it had — it was po[i]sed, back end dip position.... I don’t know if you’ve ever noticed when dogs get really like wild or violent they come and they bear down on their back legs in kind of a striking-type thing.” A 432. Eberly testified:
The dog at that point, as it came around the back [of a parked car], came towards me, barking and growling and, again, put his feet forward and took a stance and took like a, he was protecting, whatever, stance. At that point the dog went back on his hind legs and came forward off his hind legs, and it looked like the dog was going to attack me from how he sprang forward. At that time I though he was coming for me. When he came off his back legs and came towards me, I raised my weapon and fired.
A 396-97; see also Eberly’s Testimony, A-406 (explaining that “she rocked back and forth on her hind legs and started to come forward. It looked like, from my experience, this dog was lunging and going to attack me.”). Eberly shot five times, hitting the Rottweiler three or four times.[3]
Even disregarding Eberly’s and Grim’s testimony, and viewing the facts, as I must, in the light most favorable to the Browns, Eberly’s actions were objectively reasonable. It is uncontested that the dog was a Rottweiler,[4] that it was unleashed and uncontrolled, and that it had been *226 barking. Nothing in the record establishes the majority’s conclusions that Eberly knew the family to whom the dog belonged, that the Browns owned the dog and lived in an adjacent house, or that the Browns were available to take the Rottweiler in custody. Nor can the record be read to show that Eberly shot the Rottweiler without any provocation. See Maj. Op. at 209. Moreover, Eberly’s testimony that he heard and saw no one before shooting is also not disputed. Contrary to the majority’s statement of facts, Ms. Brown’s testimony concerning when and what she shouted to Eberly is both ambiguous and equivocal. She did not state that when the officer reached for his gun, she shouted “That’s my dog, don’t shoot!” Maj. Op. at 209. Rather, referring to what Ms. Brown herself testified to, these are the operative facts:
Q: So you saw his right arm move and you yelled something?
A: Yes. í>
Q: What did you yell? <o
A: At that point I’m not exactly sure what I yelled. I know once he started shooting I know what I yelled. I just started screaming.
Q: You don’t know what you yelled?
A: I believe it was, “That’s my dog,”. but I’m not positive.
Q: As you sit here today, do you know what you yelled?
A: I don’t know in order. I know that words must have come out of my mouth, but I don’t know for certain what I said.
A 104-06 (emphasis added).
Because Ms. Brown did not know what she said and when she said it, reliance *227 cannot be had on her testimony as related in the majority opinion. All we can glean from the record is that at some point in time after Eberly fired at the Rottweiler, she started screaming. But we cannot know what she said and at what point she claimed the Rottweiler as hers, Moreover, in light of the record which I have just reproduced above, it cannot be said that Eberly heard anything until after he had fired his weapon.[5]
In particular, I stress that the majority’s conclusion that Ms. Brown claimed ownership of the dog prior to the shooting— because it depends so heavily on Yoder’s testimony — is flawed and inaccurate. Let me explain why.
The majority opinion in its extensive footnote 5, in an effort to bolster its conclusion that Eberly knew that the Rottweiler’s owner was available and anxious to take custody, unfortunately recites testimony which was not available for consideration by the District Court. It is by no means available for consideration by us, and should not be relied upon in the majority opinion because the testimony of Russell Yoder was taken in connection with a Civil Service Commission Hearing, and is inadmissible into evidence under Fed.R.Evid. 804(b)(1).
That Rule requires such testimony, in order to be admissible as an exception to the hearsay rule, to be accompanied by proof (1) that the declarant — in this case Yoder — was unavailable to testify, (2) that the testimony was taken at a hearing, deposition, civil action or proceeding, and (3) that the party against whom the testimony is now offered — -in this case Eberly — had an opportunity to test the testimony by examination. New Jersey Turnpike Authority v. PPG Industries, Inc., 197 F.3d 96, 110 (3d Cir.1999); Kirk v. Raymark Industries, Inc., 61 F.3d 147, 164-65 (3d Cir.1995).
Here, Yoder’s testimony was taken before a Civil Service Commission with nothing appearing in the record to establish his availability or unavailability in the instant proceeding, nor can we tell from the record, by which we are bound, whether the Commission Hearing — not a court proceeding-satisfied the other elements of the Rule so as to permit consideration in this summary judgment proceeding. See New Jersey Turnpike, 197 F.3d at 110. Nor is the majority opinion’s explanation and its citations to Williams v. Borough of West Chester, Pennsylvania, 891 F.2d 458, 466 n. 12 (3d Cir.1990) and Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) an answer to Yo-der’s unavailability. Williams, referring to Celotex, is no more than dictum, while Celotex refers only to appropriate admissible affidavits or depositions, neither of which appear in the instant record other than through Yoder’s administrative testimony. Hence by any evidentiary test, Yoder’s prior testimony before an administrative tribunal was not admissible for consideration here because Yoder must be considered “available” on this record where it is undisputed that there is no finding to that effect.
Indeed, the District Court judge did not, so far as I can tell, rely on that evidence in any particular and it has only been resurrected by the majority on this appeal so as to shore up its conclusion that Eberly should be liable. It would have been an abuse of discretion for the District Court to have admitted and considered this testimony without a finding of unavailability, *228 see Kirk, 61 F.3d at 165, and the burden of proof of unavailability, as well as the other elements of Rule 804(b)(1), rests upon the proponents of the testimony- — here, the Browns. An examination of the record reveals that it is completely silent as to Yoder’s availability. Hence, it is inappropriate — indeed it is error — -for the majority to rely on inadmissible hearsay testimony whose reliability has not been tested. Without Yoder’s testimony — testimony which the majority opinion relies upon so heavily — the majority’s conclusion simply cannot stand.
V
It is crystal clear to me that even in the face of a Fourth Amendment violation, which as I have noted may be problematical, see n. 2, supra, Eberly’s conduct as a police officer in discharge of his statutory duty was not only appropriate but no clearly established constitutional right stemming from the occurrence of his shooting the Browns’ dog would or could have been known to any reasonable person. Unfortunately, the majority opinion has not seen fit to announce a standard for clearly established doctrine in the context of qualified immunity, and by failing to do so, it obviously could not relate the actions of Officer Eberly to an unarticulated standard. Thus, by this failure, it has abdicated this Court’s responsibility to balance “the interests in vindication of citizens’ constitutional rights and in public officials’ effective performance of their duties.” Anderson, 483 U.S. at 639, 107 S.Ct. 3034 (internal quotations omitted), and has made it impossible for officials within our jurisdiction to reasonably anticipate when their conduct may give rise to liability for damages.
Because I cannot join such an opinion which disregards the content of an acknowledged doctrine, I would affirm, in its entirety, the District Court’s judgment of May 22, 2000 which granted summary judgment for Officer Eberly and the other named defendants.[6] To the extent that the majority holds otherwise, I respectfully dissent.

. The Second Circuit has at least crafted a standard against which the second prong of the qualified immunity analysis can be tested. That standard is similar to the one I have just suggested. See Horne v. Coughlin, 155 F.3d 26, 29 (2d Cir.1998).

. I have assumed that a Fourth Amendment violation has occurred for purposes of this case. I point out, however, that the District Court adverted to the dog being abandoned, undoubtedly because it was unleashed, out on the street, under no control of an owner, and was barking at a police officer. Inasmuch as an element of the Fourth Amendment violation requires a determination of being unreasonable which may fall within the jury’s purview but which is a decision which could not be rendered by a jury if qualified immunity attached, because the grant of qualified immunity would preclude a trial being held, I point out no more than that the issue of a Fourth Amendment violation in the case of an unleashed, uncontrolled Rottweiler barking at a police officer on a public street leaves much to be desired in the way of satisfying the strictures of a Fourth Amendment seizure, and is completely distinguishable from Fuller v. Vines, 36 F.3d 65 (9th Cir.1994) (holding that plaintiffs stated a Fourth Amendment violation in alleging that police officers killed plaintiffs' dog in the plaintiff’s yard) and Lesher v. Reed, 12 F.3d 148 (8th Cir.1994) (holding that police officers' removal of a dog from inside plaintiffs’ home fits "within the meaning of the Fourth Amendment").

. In a later part of this dissent, I have criticized the majority for having relied upon the testimony of Russell Yoder, which does not satisfy the requirements of Fed.R.Evid. 804(b)(1) and which is therefore inadmissible hearsay. It may well be that Grim's testimony suffers from the same failing, in which case I should not consider it any more than Yoder's testimony. Accordingly, I have disregarded not only Grim's testimony, but also the testimony of Officer Eberly, since we are bound on summary judgment to view all of the evidence and to credit all of the inferences in favor of the plaintiffs.

. Surprisingly, the majority opinion has failed to inform the reader about the characteristics and nature of a Rottweiler that should be taken into consideration in assessing the reasonableness of Eberly’s actions. While the *226 record does not disclose this information, we can take judicial notice of these traits from the American Kennel Club’s descriptions (www.akc.org) and the American Rottweiler Club’s "Introducing the Rottweiler” (www. amrottclub. org).
The American Rottweiler Club describes a Rottweiler as "a robust, powerful and loyal breed.... He is an outstanding companion and guard but ownership of a Rottweiler carries much greater than average legal and moral responsibilities, due to traits possessed by this breed, their size and strength.... Males range from 24" to 27" at the shoulder and 95-135 lbs in weight. Females are somewhat smaller, 22" to 25" tall and 80 to 100 lbs.”
"The Rottweiler is very strong for its size. It has been used in Europe to pull carts and retains the compact musculature desirable in a draft animal. A full grown adult can easily knock a human off his feet.... Obedience training is a must because of the animal’s size and strength; you must be able to maintain complete control of your animal at all times.... [Aggressiveness] varies with the individual dog to some degree, although all have a strong territorial instinct and will defend their master's home, car and property from intruders. Rottweilers have also been known to bully or bluff their owners or other people, a trait that is most disconcerting.... Although the Rottweiler does not usually bite without provocation, even being cornered and held by one of these dogs is a very unnerving experience for meter men, delivery persons or neighbors wandering into the yard while the owner is absent.” American Rottweiler Club, "Introducing the Rottweiler.”
The American Kennel Club states, "[t]he ideal Rottweiler is a medium large, robust and powerful dog.... His compact and substantial build denotes great strength, agility and endurance. Dogs are characteristically more massive throughout with larger frame and heavier bone than bitches.... Dogs [range from] 24 inches to 27 inches. Bitches [range from] 22 inches to 25 inches.”
Although it is sad to learn of the death or injury of any pet, I cannot overlook the apprehension that an individual — particularly a police officer, who has a duty to protect and ensure the safety of the public — may have when faced with an unleashed, uncontrolled, barking Rottweiler.

. Although in the qualified immunity summary judgment context we could not rely upon Eberly’s testimony if it was disputed, here no one can contest Eberly's statement made in his deposition that “[a]fter the shooting, that’s when I heard voices."

. For largely the same reasons discussed above, I would also hold — -as I stated earlier— that Eberly's conduct, based solely on the record supporting the Browns' position, could not constitute an intentional infliction of emotional distress.